IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2024

## STATE OF TENNESSEE v. JORDAN BALLARD

**Appeal from the Circuit Court for Lake County**
**No. 20-CR-10720   Mark L. Hayes, Judge**

_____

### No. W2023-01266-CCA-R3-CD

_____

The Defendant, Jordan Ballard, was convicted by a Lake County Circuit Court jury of aggravated kidnapping, a Class B felony; rape, a Class B felony; aggravated assault, a Class C felony; and assault, a Class A misdemeanor.  *See* T.C.A. §§ 39-13-304 (2018) (aggravated kidnapping), 39-13-503 (2019) (subsequently amended) (rape); 39-13-102 (Supp. 2020) (subsequently amended) (aggravated assault); 39-13-101 (Supp. 2020) (subsequently amended) (assault).  The trial court imposed concurrent sentences of ten years for aggravated kidnapping, ten years for rape, four years for aggravated assault, and eleven months, twenty-nine days for assault, for an effective ten-year sentence.  On appeal, the Defendant contends that the evidence is insufficient to support his aggravated kidnapping conviction.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Sean Patrick Day, District Public Defender; Jessica F. Butler (on appeal), Assistant District Public Defender – Appellate Division; and Amanda Gentry (at trial), Nashville, Tennessee, for the appellant, Jordan Ballard.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Danny Goodman, Jr., District Attorney General; Lance E. Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to a violent attack against his former girlfriend, which resulted in an indictment charging him with especially aggravated kidnapping,

aggravated rape, and two counts of aggravated assault.[1]  The Defendant was convicted of aggravated kidnapping, rape, aggravated assault, and assault.

At the trial, Ridgely Police Officer Blake Whitlow testified that on August 27, 2020, he responded to Angela Ballard's home after Alexis Ballard reported to the police that blood was "all over" her home and that her brother, the Defendant, was inside a locked bathroom.[2]  Officer Whitlow said that he arrived at the home around 1:30 a.m., that Ms. Ballard was outside, and that Ms. Ballard allowed him to go inside the home.

Officer Whitlow testified that inside the home, he saw "blood droplets" throughout the kitchen, hall, and a bedroom near the kitchen.  He said that blood was "all over the room" and that he concluded a physical altercation occurred.  Photographs of the bedroom were received as exhibits and reflect a significant amount of blood in the bedroom, including on a lamp, the floor, an ottoman, the bed, the bedding, a suitcase, a lamp shade, the walls, and the curtains. The photographs also reflect broken glass.  He did not find anyone inside the home, including the bathroom into which Ms. Ballard had been unable to enter.  Officer Whitlow said, though, he spoke to the Defendant by telephone while Officer Whitlow was at the home.  He said the Defendant reported that he "fell on the back steps and hit his head."  Officer Whitlow said that he did not find any blood on the steps at the rear of the home, that he told the Defendant about the lack of blood on the steps and about the abundance of blood inside the home, and that he asked the Defendant to explain what occurred.  Officer Whitlow stated that the Defendant said he fell but "was fine."  Officer Whitlow said the Defendant did not mention an altercation between the Defendant and his former girlfriend.

Officer Whitlow testified that Mrs. Ballard arrived at the scene, went inside the home, and walked to the bedroom.  Officer Whitlow said that after Mrs. Ballard entered the bedroom, she called the Defendant, who answered the call.  Officer Whitlow said that he overheard a portion of their conversation in which the Defendant asked if the police were still at the home and that "at that point," Mrs. Ballard walked away from Officer Whitlow.  Officer Whitlow said that he, along with a deputy who was assisting him, walked outside the home and that Mrs. Ballard came outside after ending the call with the Defendant.  Officer Whitlow said Mrs. Ballard stated that "[f]rom what it sounds like it's mutual" and that the Defendant reported to Mrs. Ballard that "the victim had hit him first."

Officer Whitlow testified that he found the Defendant's hat outside the home and that he saw "tire tracks that were coming from the driveway" and were "cutting around to

---

[1] It is the policy of this court not to identify victims of sexual assault.

[2] Because Angela Ballard, the Defendant's mother, and Alexis Ballard, the Defendant's sister, share the same surname, at times we refer to Angela as Mrs. Ballard and to Alexis as Ms. Ballard.

the front side" of the home. He said the tracks were consistent with someone having driven a vehicle through the yard. Photographs of the tire tracks throughout the yard were received as exhibits.

On cross-examination, Officer Whitlow testified that Ms. Ballard was frantic and upset when he arrived at the home. He said that a "dog gate" was "knocked over" inside the home but that he did not recall whether any dogs were inside the home. He recalled that he had to push open the bathroom door with a small amount of force but that the door was unlocked. He said that someone had recently showered or bathed based upon the amount of condensation inside the bathroom. He recalled that he found a bloody towel inside the bathroom and said that the bathroom window above the toilet was closed. Referring to a photograph of the ottoman in the bedroom, he stated that "there was a lot of blood [on the floor] . . . in front of the ottoman." He said "it appeare[d] that somebody was in that vicinity for a while for that amount of blood" to accumulate on the floor. He said he saw a bloody towel and blood in the bathtub. He did not find any blood outside the home. He said the tire tracks "curved around" the home from the "back driveway curving toward the front driveway." He did not see any weapons but saw broken "heavy duty" glass inside the home.

Lake County Sheriff's Department Deputy Zachary Sanford testified that he responded to the scene to assist Officer Whitlow. Deputy Sanford stated that he, Officer Whitlow, and Ms. Ballard walked to the bedroom. Deputy Sanford said that blood, jewelry, and shards of glass were scattered throughout the bedroom and that he became concerned someone was seriously injured or deceased. He said that during the telephone call with the Defendant previously described by Officer Whitlow, Deputy Sanford said that he asked the Defendant why the blood was on the lampshade and why "human tissue" was on a shard of glass. Deputy Sanford said that the Defendant told Officer Whitlow that the Defendant fell and struck his head. Deputy Sanford said that the Defendant denied knowing about the shard of glass but said that it was possible he could have "blacked out and fell into" the glass when he entered the bedroom. Deputy Sanford said the Defendant did not report being attacked by anyone.

On cross-examination, Deputy Sanford testified that although he did not recall a dog gate inside the home, he recalled that dogs were outside the home. He agreed that the bathroom blinds were lowered on the window and that he did not examine the window. He said he saw a small amount of blood inside the bathroom. He said that he was at the scene for about an hour and that to his knowledge, additional law enforcement officers did not respond to the scene after he and Officer Whitlow left. Deputy Sanford said that he and Officer Whitlow did not collect any evidence from the home.

The victim testified that she and the Defendant were romantically involved for two years and that she ended their relationship around late July or early August 2020, when they lived in Kingsport, Tennessee. She said that she had attempted to end the relationship three or four times but that the Defendant "would throw a fit or start a fight," which usually ended with the Defendant locking himself in the home and threatening to kill himself. She said the Defendant's threats scared her and that before July or August 2020, she stayed in the relationship. She said that she ended the relationship after the Defendant "pulled out a gun and was loading it," threatening to harm them both.

The victim testified that although she moved back to West Tennessee, the Defendant remained in East Tennessee. She said that when the Defendant visited West Tennessee, he sent her text messages in which he begged her to meet him and to reconcile. She acknowledged that she met with the Defendant once before the incident in this case, that the Defendant said he could not live without her, and that she told him they needed to live separate lives. She said that they talked, that no violence occurred, and that they were not intimate physically.

The victim testified that on August 26, 2020, she went to the river with her friends, that the Defendant continuously sent text messages and called her cell phone during the day, and that she placed her phone in airplane mode to prevent her phone from receiving any additional calls or text messages. She said that she drove home after dinner, that she disengaged airplane mode on her phone, and that she received multiple messages from the Defendant. She said the Defendant's initial messages stated that he would be at her home waiting for her and that his last message stated that she needed to come to Mrs. Ballard's home to pick up the victim's late-grandmother's belongings or the Defendant would throw them away. The victim stated that she did not want the items, which had sentimental value, to be thrown in the trash and that she agreed to meet the Defendant at the home.

The victim testified that she arrived at Mrs. Ballard's home around 10:00 p.m., that she parked in the driveway, and that the Defendant parked his truck behind her car. She said that they stood under the carport, that the Defendant wanted to know with whom she had been and what she had done all day, and that she told him, "[I]t wasn't any of his business." She said that they argued initially, that the Defendant shoved her backward, that she fell on the ground, that the Defendant, who was "over top" of her, held her shoulder and shook her, and that her head "was hitting the concrete." She said that she became scared and that she "shoved [herself] backwards and slid . . . underneath his truck to get away from him." She said that the Defendant walked to her car, retrieved her cell phone from inside her car, and pulled her out from under his truck. She said she wore shorts and a t-shirt and was injured when the Defendant pulled her from under the truck. She said that the Defendant grabbed her by the arm and "pulled her into the house." She said that she attempted to "fight with" the Defendant and held onto the door frame to prevent him from pulling her inside the home. She acknowledged she might have damaged the doorway,

-4-

including the doorbell camera, during the struggle. She said that the Defendant pulled her into his mother's bedroom, closed the door behind him, and demanded to look at her cell phone.

The victim testified that the Defendant entered what he thought was her cell phone passcode but that the code did not unlock the phone because she had changed the code. She said that the Defendant asked for the code and that she declined to provide it, at which time the Defendant struck her on the front of the face with an open hand. She said that he continued to demand the code, that she continued to decline, and that he struck her "every time [she] refused." She said that she provided him with an inaccurate code and that the Defendant struck her again when the code did not unlock the phone. The victim said that at this time during the incident, the Defendant struck her with an open hand. She said that the Defendant became angrier, that she ultimately gave the Defendant the correct code, but that the Defendant was no longer interested in her phone. She said that she asked the Defendant "what was going on, what was he thinking, why we were doing this?" She said she was scared, cried, and apologized because she did not understand why the Defendant was "so mad."

The victim testified that the Defendant told her to undress, that she refused, that the Defendant struck her, and that she complied. She said that the Defendant told her to lay on the bed, that she complied while crying, and that she "ma[d]e it clear to him [she] did not want to do this." She said that the Defendant told her "it was going to get worse," if she did not stop crying and that the Defendant "just started having sex with [her]." She said that the Defendant penetrated her vagina with his penis as she cried but that he stopped, told her that he would kill her if she bit him, and placed his penis in her mouth. She said the Defendant ejaculated onto her chest.

The victim testified that as the Defendant dressed afterward, she asked if she could go to the bathroom, that she "had to beg for his permission to go to the bathroom," that she did not feel she was free to leave, that the Defendant opened the bedroom door, and that she entered the bathroom. She said that she was naked, that the Defendant "started following" her, and that she slammed the bathroom door behind her. She said that she heard the Defendant's footsteps move away from the bathroom, that she ran to the bathroom window, that she "shoved the window open" and "pushed" out the screen, and that she climbed on the toilet seat and through the window. She identified a photograph of the bathroom and said that nothing was on the toilet tank when she fled the home and that she damaged the window screen. The victim said that she ran toward her car but that by the time she reached the corner of the home, the Defendant "was coming out the back door." She said she continued running, that she ran past the vehicles into the yard, and that the Defendant tackled her to the ground. She recalled that she saw a car coming by, that she attempted to kick her legs and wave her arms, but that the Defendant held her down.

The victim testified that after the car passed the home, the Defendant stood, grabbed her by her hair, and "started pulling [her] back to the house by [her] hair." She said that she was still naked and that the Defendant dragged her through the grass in the yard and onto the concrete driveway, scraping her body. She identified a photograph depicting scrapes and scratches to her upper thigh and buttocks and stated the injuries were caused by the Defendant's dragging her across the concrete. She said that the Defendant dragged her inside the house, that he took her to his mother's bedroom, that he shoved her into the corner between the bed and the wall, that she fell to the floor, and that the Defendant hit her "too many [times] for [her] to count." She said that at this point, the Defendant struck her on the face, including her left eye, with his fists. She said that she reached for a nightstand where a glass bowl lay, that she grabbed it, and that she hit the Defendant on the head with it. The victim thought the Defendant would stop hitting her but said the bowl broke, and he became angrier and continued striking her.

The victim testified that she "started seeing red" and realized she "was bleeding everywhere." She said she suffered a broken nose and orbital bone during the incident. She identified photographs of her facial injuries, including a swollen and blue eye and tape over her nose, and said the Defendant caused those injuries. She denied that her injuries were caused by an ATV accident. She said that the blood did not stop the Defendant from continuing to hit her but that at some point, she started apologizing "[b]ecause he was mad" and because she hoped the Defendant would stop hitting her. She said the Defendant told her that she was going to die, and she believed him. She said the Defendant threatened to kill them both. She said the Defendant stated that they were not "gonna make it through the night."

The victim testified that she suggested they go outside to smoke a cigarette, that she dressed, and that they went outside. She said, though, that when the Defendant opened the door to his truck to retrieve his cigarettes, she "went and jumped in [her] car and tried to leave." She said her nose was still bleeding when she fled. She said that she drove "straight out of the driveway" but that the Defendant "caught" her and opened the driver's door. She said the Defendant leaned over her, tried to put the car in park or turn off the engine, and that he grabbed the steering wheel, which resulted in her car going through the yard. She said that the Defendant pulled her out of the car, that she fell onto the grass, and that she stood, screamed, and ran through the yard and across the roadway toward a neighbor's home. She said that the Defendant tackled her to the ground before she could reach the home and that he pinched her throat to prevent her from screaming, leaving red marks on her throat. She said that when she stopped screaming, the Defendant stood and dragged her by her hair toward the home. She said that before the Defendant dragged her across the roadway, she stood because she did not want to be dragged across the pavement, that the Defendant asked her why she continued to run away from him, and that she told him "[b]ecause I don't want to die." She said her "whole body was just ready to give up."

-6-

The victim testified that she apologized to the Defendant for running away, told the Defendant she would not run again, and that she suggested they sit on a picnic table outside the home. She said that she begged to go to the hospital, that he agreed to take her to the hospital if she bathed and told the medical staff her injuries were from an ATV accident. She said that although the Defendant told her to shower, she sat in the bathtub and let the water run over her to wash off the blood but that she did not wash her entire body. She said that the Defendant stood in the bathroom as she sat in the bathtub and cleaned herself and that the Defendant was never in the bathroom without her. She said that the Defendant gave her a clean shirt to wear to the hospital and that the Defendant drove her car to the hospital. When asked why the Defendant drove, she said she did not "feel like [she] could." She said the drive to the hospital was approximately thirty minutes, during which time she did not look at the Defendant. She said that the Defendant returned her cell phone when they arrived at the hospital, that the Defendant sat with her until she was placed in an examination room, and that the Defendant left. She said that after the Defendant left and she was in an examination room, she sent text messages to her parents informing them that she was at the hospital due to an ATV accident. She said the hospital transported her by ambulance to a hospital more capable of treating her injuries.

The victim testified that when she was in the ambulance, the Defendant sent her social media messages stating that he had cleaned the home and had spoken to the police. She said the Defendant told her that he would press assault charges against her if she told the police what occurred and that she would lose her nursing license. She said the Defendant also threatened to kill her if she told anyone the truth. She said that she ultimately spoke with someone who advised her to speak to the police. She said that she learned at the hospital in Memphis that she suffered "a blown orbital socket" and a broken nose. She said that although she did not have pain at the time of the trial, she had "breathing problems" due to a deviated septum. She said she could only breathe through one side of her nose.

The victim testified that she provided a statement at the Ridgely Police Department and that a Tennessee Bureau of Investigations (TBI) agent photographed her injuries and took her for a physical examination. Referring to the photographs taken during the physical examination, the victim said the Defendant caused all of her injuries.

On cross-examination, the victim testified that although she and the Defendant had a "volatile" relationship, the night of the incident was the worst. She said that although the items she stored at Mrs. Ballard's home had been there for a long time, she went to the home on the night of the incident because the Defendant threatened to throw the items in the trash if she did not pick them up that night. She said that she called the Defendant to tell him she would come to the home to pick up her belongings, that she left her car key fob and cell phone inside her car when she arrived, and that she only intended to retrieve her belongings and leave. She agreed that she and the Defendant yelled at each other

-7-

outside the home and said that they argued about the Defendant's wanting to know where she had been and with whom she had been earlier in the day.

The victim testified that while outside the home, the Defendant shoved her, that she fell backward onto the concrete near the Defendant's truck, that she "scooted" under the truck, and that the Defendant walked to the driver's side of her car. She said that when he returned to the truck, he pulled her by her foot out from under the truck, that he grabbed her arm, that he pulled her to her feet, and that he pulled her toward the home, which was unlocked, by her arm. She said that the Defendant opened a dog gate inside the home when he pulled her through the home. She said the Defendant did not strike her until he pulled her into the bedroom.

The victim testified that the Defendant did not ask her to leave. She said that she asked to go to the bathroom while the Defendant dressed and that she did not "feel like [she] could just go. [She] didn't feel like [she] had free will just to get up and go to the bathroom." She said that she did not go toward the front, back, or side doors to leave the home because she did not think she "could get to them." She thought going to the bathroom and locking the door was the "best way to get out." She said that she went through the bathroom window feet first as soon as she locked the door.

The victim testified that she ran toward her car, that the key fob was still inside the car, and that her handgun was inside the center console of the car. She said that the Defendant chased her, that she ran past her car, that the handgun inside her car "never crossed [her] mind," and that she "was just trying to get away" from the Defendant. She recalled that she grabbed and pulled on the home's door frame and that the doorbell camera fell. When asked if she fought back against the Defendant's striking her with a closed fist, she said she struck the Defendant with the glass bowl while he stood over her and she lay on the floor in a "crouched up . . . defensive position." She said that the Defendant bled after she struck him with the glass bowl. She did not know how blood came to be on her hair and said she only bled from her nose. She said that she never intended to smoke a cigarette outside, that she only wanted to get outside the home and attempt to leave.

The victim testified that the Defendant took her cell phone but that she did not know where he placed it inside the bedroom. She said that the Defendant put her car in park after he pulled her from her moving car. She denied that the Defendant bathed with her before going to the hospital but said that he "stood there" in the bathroom while she bathed. She said that the majority of the blood inside the home came from her nose, not the Defendant's forehead, and that blood gushed from her nose. She did not know if there were any weapons inside the home. She said that the person who advised her to speak with the police was an Obion County law enforcement officer, who was a close family friend.

-8-

The victim testified that she did not know why the Defendant left the hospital but that he knew her parents were en route to the hospital. She agreed that she had filed a two-million-dollar lawsuit against the Defendant because of his conduct in this case.

On redirect examination, the victim testified that although her handgun was inside her car, the only thing she thought about during the incident was "[g]etting away from him." She said that Mrs. Ballard "had taken [her] . . . multiple times" to civil court and that her attorney in those matters recommended filing a lawsuit against the Defendant before any statute of limitations period would have barred her from obtaining compensation for her injuries, pain and suffering, lost wages, and medical bills.

On recross-examination, the victim testified that the civil matters involving Mrs. Ballard were related to the victim's car, which was owned by the Defendant's family. The victim said that she had offered to return the car. The victim said that Mrs. Ballard accused the victim of stealing guns and that she had to prove in court that she owned them. Regarding her cell phone, the victim said that ownership of the phone was transferred to her and that she paid the bill.

TBI Special Agent Justin Tubbs testified that he and TBI Special Agent Matt Harbor investigated this case at the request of the district attorney's office. Agent Tubbs said that he and Agent Harbor interviewed the victim at the Ridgely Police Department and that Agent Tubbs collected evidence at the crime scene. Agent Tubbs said that he collected swabs of what appeared to be blood, bed linens that had been removed from the bedroom and placed in the laundry room, shorts with what appeared to be blood on them from the laundry room, a broken glass dish from the kitchen with what appeared to be blood on it, and a t-shirt with what appeared to be blood on it from the kitchen. Photographs of these items were received as exhibits. Agent Tubbs said that although blood was still inside the home, Mrs. Ballard stated she had attempted to clean some of the blood in the bedroom.

Agent Tubbs testified that he collected evidence from the victim's car and that he found what appeared to be blood on the driver's door frame and on the driver's seat. Photographs of the victim's car were received as exhibits. Agent Tubbs stated that he did not recall observing any blood on the passenger side of the victim's car. He said he obtained swabs of what appeared to be blood from the car for analysis. He said he photographed the Defendant at the jail on an unspecified date. The photographs were received as exhibits and reflect a scratch on the Defendant's nose, a small scratch on the Defendant's forehead, and a large, horizontal "gash" with dried blood on the Defendant's forehead. The photographs, likewise, depict the Defendant's hands, which Agent Tubbs said did not show anything that "stood out." Agent Tubbs also collected the victim's cell phone for analysis.

On cross-examination, Agent Tubbs testified that he went to the crime scene on August 28, 2020. He said that he entered the home through the back door and that a doorbell camera, which had previously been attached to the back door frame, lay on a table near the door. He did not see any evidence that an altercation occurred outside the home. Agent Tubbs said Mrs. Ballard stated that she had washed the comforter but that she had not washed the sheets. He said that the corner of the bathroom window screen was torn and that the window was closed. He said he photographed the victim's car on August 28.

On redirect examination, Agent Tubbs identified a photograph of the bathroom, which was received as an exhibit. Referring to the photograph, Agent Tubbs said no items were on the toilet tank. He identified photographs of the torn window screen, which was received as an exhibit. He said the window screen was not attached to its frame.

TBI Special Agent Matt Harbor testified that he interviewed the victim and photographed her injuries. The photographs, which were received as exhibits, reflect multiple wounds to the victim's face and extremities. The victim wore medical tape on her nose, and she had a black and swollen left eye. The victim had numerous bruises on her arms, legs, and face; blood on her hair and face; horizontal markings on her neck; and scratches on her upper thigh and buttock areas.

Agent Harbor testified that that after the victim's interview, the victim underwent a medical examination at the Rape Crisis Center in Shelby County. He said that he went to the crime scene and that the blood in the bedroom "appeared to be smeared as if someone had wiped it." He noted that the comforter had been removed from the bed and washed. He said the scene was "one of the more gruesome" scenes he had encountered. He said that he collected swabs of blood, shorts, a pillow, a lampshade, and a broken jewelry dish. Referring to a photograph of the bathroom, he said that the photograph was taken before he entered the room and that nothing lay on the toilet tank. He said that he raised the bathroom window and that the screen had been "somewhat torn away" from the screen frame. He said he examined the window because the victim reported that she attempted to escape the home by kicking out the window screen. He said that the window was large enough for the victim to crawl through. He said he obtained a warrant for a sample of the Defendant's DNA.

On cross-examination, Agent Harbor testified that after the victim's interview, he attempted to find the Defendant. He said that when he was unable to find the Defendant, he went to the crime scene, which was not secured. He said anyone could have been inside the home. When asked how far a person would "have to go down" after climbing out of the bathroom window, he said that it was "a safe enough distance" that would not result in injury and that grass was below the window. He said that fresh tire tracks were visible in the yard. He said the doorbell camera lay on an outside table.

TBI Agent Sara Lawrence, an expert in the field of forensic biology, testified that although multiple items were submitted for analysis, she focused on the chest and vaginal swabs obtained during the victim's medical examination and shorts obtained from the laundry room of the home. Ms. Lawrence said that her analysis showed the presence of sperm cells on the chest and vaginal swabs, that the Defendant's DNA profile was the major contributor on the sample from the chest swab, and that she was unable to identify the DNA contributor from the vaginal swab.

Ms. Lawrence testified that the Defendant's blood was on outside of the shorts obtained from the laundry room. She said that the analysis did not detect semen on the inside of the shorts. She said that the inside waistband, inside leg cuffs, zipper, and button contained the victim's and the Defendant's DNA profiles. She said that the inside of the shorts was not analyzed for the presence of blood and that the DNA profiles could have been from skin cells.

On cross-examination, Ms. Lawrence testified that oral and vulvar swabs, the victim's underwear, and the victim's shorts did not show the presence of semen and that the remaining items collected were not analyzed. She said the victim's blood was not found on the shorts.

Nurse Practitioner Kristine Gable, an expert in the field of sexual assault examinations, testified that she performed the victim's examination on August 28, 2020. Ms. Gable stated that the victim reported going to Mrs. Ballard's home to pick up some of her belongings, which had been left after she and the Defendant ended their relationship one month before the incident. The victim reported that the Defendant called her, that he requested she pick up the items, and that she arrived at the home around 10:45 p.m. The victim reported that the Defendant dragged her inside the home, hit her, held her down, and held her throat with his hand. The victim reported that the Defendant told her to remove her clothes, that she refused, that the Defendant hit her on the face with his fist, and that as a result, she complied. She said that he "made" her get on the bed, that he climbed on top of her, that she cried and begged him to stop, and that he pinched the front of her neck to prevent her from talking. The victim reported nonconsensual vaginal and oral penetration with the Defendant's ejaculating on her chest and in her mouth. The victim reported that afterward, she went to the bathroom, locked herself inside, and jumped out of the window but that the Defendant ran outside and "pulled" her back inside the home. The victim reported that the Defendant assaulted her until 3:00 a.m., at which time the Defendant agreed to drive her to the hospital after she bathed and promised to tell medical personnel she had been in an "ATV accident." The victim reported that the Defendant left the hospital after she was taken to a private hospital room, that she told medical staff she had been in an ATV accident, and that the Defendant told her she would be "dead within 24 hours" if she reported the assault. She said she was too scared to report the truth.

Ms. Gable testified that she photographed the victim's injuries at the time of the examination. The photographs, which were received as exhibits, reflect similar injuries, bruising, and markings as depicted in the photographs taken by Agent Harbor. Ms. Gable stated the victim's injuries were acute, recent, and consistent with the victim's account of a sexual assault. Referring to photographs of the victim's injuries, Ms. Gable stated that the "nose was fractured in her orbit" and that the victim suffered a hematoma to the right forehead; yellow and red bruises and petechiae on the neck; bruising and redness on her arms, chest, shoulder, breast, and left hip and thigh; and abrasions or scratches on her left buttock. Ms. Gable said that the abrasions to the buttock were similar to injuries resulting from a "scrape along the roadway." Ms. Gable said the victim reported that the Defendant dragged her across the driveway and into the home.

On cross-examination, Ms. Gable testified that the victim reported having difficulty swallowing, a raspy voice, a left orbital fracture, body soreness, and knots on her head from "the punches inflicted." Ms. Gable said that the victim was cooperative, quiet, polite, and answered questions. Ms. Gable agreed that the victim's bruises showed "varying colors . . . on different parts of her body" and that it was difficult to determine the timing of when a bruise was inflicted. When asked if it were possible the bruising could have occurred one or two days before the incident, Ms. Gable said she did not know. Ms. Gable said, though, that the victim's bruising and injuries were consistent with her account of the sexual assault incident.

Ms. Gable testified that the examination revealed no injuries to the victim's oral, vaginal, or anal areas and that the absence of injury was "very common in rape, especially with females." Ms. Gable recalled that the victim, when speaking about the Defendant's placing his hands around the victim's throat, "demonstrated one-handed strangulation from the front." She said that bruising might or might not result from one-handed strangulation and that the victim attributed the markings on her neck to the Defendant's pinching her.

On redirect examination, Ms. Gable testified that the victim's demeanor at the time of the medical examination was not inconsistent with a person who had been sexually assaulted. The victim's medical records, which were received as an exhibit, reflect that the victim was prescribed oxycodone when she sought treatment at the emergency room. Ms. Gable said the medication treated high levels of pain.

Alexis Ballard, the Defendant's sister, was called by the defense and testified that she arrived at the home around 1:15 a.m., that the Defendant's truck was parked in the driveway, that she went inside the home through the back door, that she had unlocked the door with her key, that the dogs "came rushing out," and that she saw blood droplets on the kitchen floor. She said that the dog gate was usually closed to prevent the dogs from running outside and that she initially thought the blood was from a dog fight. She said that the kitchen was not in disarray and that she did not see signs of a struggle. She said, though,

the dog gate was "completely knocked down to the floor . . . toward the dining room." She said the gate had been secured to the doorway. She said that she called out for the Defendant, whom she thought might have been asleep, but that he did not answer. She said that she thought the Defendant was in their mother's bedroom, that she turned on the bedroom lights, and that she saw blood "all over the room." She said that the Defendant's suitcase was inside the bedroom and that she saw broken glass and jewelry on the bed. She said the bed was not made, which was unusual, a lamp was knocked over, and a jewelry dish was broken. She said she saw a lot of dried blood in the bedroom.

Ms. Ballard testified that she walked to the bathroom but that the door would not open. She said that she called her mother, who did not answer the call, and her father, who told her to call the police, and then called 9-1-1. She said that two police officers arrived within ten minutes, that she waited for the police on the back porch, and that she noticed the doorbell camera was "gone." She did not recall if the doorbell camera was there earlier in the morning.

Ms. Ballard testified that she and the two officers went inside the home, that an officer opened the bathroom, and that the bathroom did not look as though anything "was wrong with it." She said the shower curtain was "pulled," the trash can was on top of the toilet, and drops of blood were by the sink. She saw a bloody washcloth on the rim of the bathtub, which was wet, and condensation on the mirror.

Ms. Ballard testified that her mother arrived while the police officers were still at the home and that her mother spoke to the Defendant by telephone. Ms. Ballard said that she overheard her mother and the Defendant's conversation due to the call being on speaker and that the Defendant said he had fallen and had struck his head. Ms. Ballard said that she also called the Defendant, that the call was on speaker, and that one of the officers spoke to the Defendant. Ms. Ballard said that the police officers were at the home for approximately one hour and that they did not collect any evidence before they left. She said that before the officers left, the officers said, "[I]t just seems like it was a mutual thing, and nobody wants to make a report, so go ahead and clean up." Ms. Ballard said that she and her mother began cleaning the bedroom. She said that the Defendant arrived at the home around 3:00 or 3:30 a.m., which was about thirty minutes after the police officers left. She said that the Defendant's forehead was "busted open" and covered in dried blood.

The Defendant testified that he and the victim ended their relationship when they lived in Kingsport, Tennessee, and that their relationship consisted of frequent arguments. He denied that he "liked to lock" himself in the house and threaten to kill himself during arguments. He said that before the incident in this case, their arguments had not led to physical altercations, except the "one time" in which he and the victim shoved each other. He stated that in early August 2020, he fractured two bones in his foot while living in Kingsport with the victim. He said he wore an orthopedic boot for about three weeks.

-13-

The Defendant testified that on the day of the incident, he did not call or send text messages constantly to the victim but that he contacted the victim to determine if "she knew [he] was in town." He said that it was normal for them to communicate through social media, telephone calls, and text messages. He said the victim called him around 10:00 p.m., that she "yelled" at him, and that he ended the call. He said that the victim called him again and that she ended the phone. He said he called her and that they had a "back and forth for a minute." He said that before the victim's first call, he sent her a text message stating that he was going to throw away her belongings if she did not come to his mother's house "now." He said that the victim's belongings had been at his mother's house since 2018. He said that he sent the message threatening to throw away the victim's belongings "out of anger" because he and the victim had planned to spend the day together before she decided to go to the river with her friends.

The Defendant testified that the victim arrived at his mother's house moments before him. He said that they both got out of their vehicles and yelled at each other. He said that he parked his truck under the carport and that the victim's car was not "blocked" from leaving the home. He said that as they bickered, they walked to the back door but that he tried to tell her to leave because she had been drinking. He said "90% of the arguments we had when we were together, it was alcohol involved." He acknowledged that he drank a couple of beers on the night of the incident but said that the victim "had more than a couple" and was intoxicated when she arrived. He said the victim refused to leave because she thought he was "actually gonna do something to her grandmother's stuff." He said that as they walked toward the home and as he prepared to unlock the door, he threatened to call the police if she did not leave. He denied that he threatened to harm the victim. He said that he probably would not have called the police but that he wanted her to leave. He said he did not know where the victim's key fob was at this time.

The Defendant testified that after he unlocked the back door, the victim shoved him and that he "stumbled through the door." He said the victim shoved him again when they reached the kitchen. He said that he called the victim "a few choice words" and told her to leave, that the victim became more upset, that he became frustrated, and that he "kept trying to walk away." He said that the victim shoved him again, which resulted in his knocking over the dog gate, and that he "grabbed her by the arms and told her to stop." He denied that he grabbed her by the neck. He said that by this point, he had asked the victim to leave multiple times but that she refused because she thought he would have her arrested for driving under the influence.

The Defendant testified that the victim stopped shoving him, that they talked, and that they made "kind of a mutual decision[] to talk about it and work it out." He said that they talked while they sat on the ottoman inside his mother's bedroom, that the conversation was "civil," that they discussed the future, and that they had consensual sex. He denied that he ejaculated on her chest and said that he ejaculated in her vagina. He

-14-

denied that he slapped and punched her and demanded to view her cell phone. He denied that he forced the victim to undress, that anyone argued or cried, and that anyone yelled. He said that during intercourse, the victim placed his hands around her throat and noted that this was "rougher sex." He said that afterward, they talked for a few minutes, that they both dressed, and that they went outside to smoke cigarettes, at which time they each possessed their respective cell phones. He said that neither of them used the bathroom before smoking outside.

The Defendant testified that after smoking, they returned to the bedroom and talked. He said, though, they began to argue when he mentioned the victim's car payment. He said that the car was registered in his name, that they agreed at the end of their relationship she would continue to pay the loan, and that he requested money for the payment that was due around August 28. He said that they both became frustrated, that the victim said she would have the money in a couple of weeks, and that he said she would have the money if she had not been drinking all day. He said that a "switch was flipped or something," that she hit him on the throat, that he shoved her backward, that she grabbed a glass dish off the nightstand, and that she "popped" him on the forehead with the dish. He said that he "blacked out for a second," that he saw blood, and that "out of reaction [he] just punched" her. He said they stood near the bed when she struck him with the dish. He said that he had not punched, slapped, strangled, or dragged the victim before she struck him with the dish.

The Defendant testified that the victim fell onto the floor near the nightstand after he punched her and that he backed away and sat on the ottoman when he "realized what was happening." He said that a couple of minutes later, the victim sat on the ottoman with him. He did not recall if her nose bled. He said that they sat on the ottoman for about twenty minutes, that he used his shirt to stop the bleeding on his forehead, and that they cried and consoled each other. He said that when the bleeding subsided, he went to the bathroom and took a photograph of himself. The photograph was received as an exhibit and shows blood on the Defendant's face. He said the victim remained in the bedroom while he was in the bathroom.

The Defendant testified that he and the victim discussed how to proceed, that they knew they would both be arrested for domestic assault if the police came to the home, that an arrest would have had negative consequences for their employment, and that they both "came up with the story" that they had an ATV accident. The Defendant disputed the victim's testimony that he threatened to kill her if she did not tell the authorities her injuries resulted from an ATV accident. He said that they bathed together to get the blood off their bodies, that he noticed the victim's nose was bleeding when she said it was difficult to breathe, and that the water was three or four inches deep when he entered the bathtub. He recalled that they talked about taking the victim to the hospital because of her nose. He said that after they bathed, they dressed, closed the bathroom and bedroom doors, and left

for the hospital. He said he drove the victim's car to the hospital because he "always drove."

The Defendant testified that he and the victim possessed their respective cell phones during the drive to the hospital and that they sat in the waiting room after the victim spoke with the receptionist. He said that he left the hospital because he knew the victim's mother was coming to the hospital. He said the victim sent her mother a text message stating the victim was at the hospital. He said that although the victim's nose bled, his blood was on the victim's hair.

The Defendant testified that he received a telephone call from his sister after he left the hospital, that he spoke to a police officer, and that he reported he fell and struck his head. The Defendant said that the officer believed "something else went on" but that the Defendant maintained he fell and struck his head.

The Defendant acknowledged that he punched the victim only once during the incident and denied that he slapped her repeatedly, dragged her on the carport, and chased her while outside. He said that at the time of the incident, his fractured foot prevented him from picking up something heavy and that applying pressure on the foot was painful. He said that to his knowledge, the victim did not crawl out of the bathroom window and said that he did not chase her outside while she was naked. He denied that he pulled the victim from the driver's side of her car, chased her across the street, and slammed her onto the ground. He denied that, during the incident, the victim said she did not want to die.

The Defendant testified that he and the victim communicated through social media after he left her at the hospital. He said that messages were visible for a limited time and that "as soon as you tap the screen," a message was "gone forever." He denied that he threatened the victim through social media and said that the victim updated him about her medical condition and sent him photographs of her face.

The Defendant testified that he learned of the criminal charges against him from his and the victim's mutual friend. He identified photographs, which were received as an exhibit, of his hands that were taken at the Lake County Sheriff's Department. The photographs reflect no significant injuries.

On cross-examination, the Defendant testified that after he and the victim entered the home, he knew nobody else was there. He said that he only punched the victim once and that his one punch broke the victim's nose and orbital bone. He disputed that the broken bones were caused by more than one punch. He said that the victim did not escape through the bathroom window, that he did not drag her across the grass and concrete, that the victim did not attempt to escape again when they smoked a cigarette outside, and that he did not stop her from leaving the home. The Defendant said the blood inside the

-16-

bedroom belonged to him.  He agreed that there was blood on the victim's hair when they left for the hospital.

Hospital surveillance recordings from the night of the incident were received as an exhibit and portions were played for the jury.[3]  The recordings reflect that the victim and the Defendant arrived in the victim's car in the hospital parking lot on August 27, 2020, at 1:30 a.m., that the Defendant had driven the car, that the victim had been in the front passenger seat, and that the victim walked in front of the Defendant in the parking lot. They walked inside the emergency room at 1:31 a.m.  The Defendant walked a short distance in front of the victim as they entered the building.  The Defendant wore shorts, a shirt, and tennis shoes.  He did not wear an orthopedic boot.  The victim wore a shirt and shorts but was barefoot.  They sat in the waiting room for a brief time before a staff member came to the door.  While the Defendant and victim sat side-by-side in the waiting room, the Defendant rubbed the victim's left leg, and the victim moved her leg away from the Defendant and turned her head in the opposite direction.  The victim held papers in her hand.  A staff member came to the door, and the Defendant and the victim walked through the door with the staff member, down a hallway, and into another room.  The victim's and the Defendant's faces reflect injuries.  At 2:00 a.m., the victim was pushed in a wheelchair by a staff member, and the Defendant walked several feet behind.  The victim and two staff members turned down a hallway, and the Defendant followed a third staff member in another direction.  The Defendant left the hospital alone at 2:01 a.m., and the victim's car left the parking lot at 2:02 a.m.

Referring to the recordings, the Defendant identified himself and the victim walking into the hospital, inside the waiting area, and the Defendant's leaving the hospital.  The Defendant stated that he left the hospital when the victim was taken to a procedure room for an MRI.  The Defendant said that he wore the orthopedic boot for three weeks but that at the time of the incident, he only needed to wear the boot if he were "doing something strenuous."  He said that he could walk normally and that he walked "fine" if he wore tightly laced tennis shoes, as he wore at the hospital.

The Defendant testified that he provided his attorney with a "handwritten story" of the incident within one week and that his version of the events had not changed.  He said that he and the victim stood near the right side of the bed when the victim struck him with the glass bowl and that they stood close enough for him to "lash out and punch her in the nose."  Referring to photographs depicting blood spatter on a lamp and nearby wall, he said that the blood probably came from his spitting due to the blood on his face.  He acknowledged that he did not refer to his spitting during his direct examination.

---

[3] The recordings do not include audio.

-17-

On redirect examination, the Defendant testified that he saw the victim's handgun inside her car on the night of the incident. He said the victim held her cell phone as she walked inside the emergency room. He said that he and the victim hugged and kissed before he left the hospital.

Upon this evidence, the jury found the Defendant guilty of aggravated kidnapping, rape, aggravated assault, and assault. The trial court imposed concurrent sentences of ten years for aggravated kidnapping, ten years for rape, four years for aggravated assault, and eleven months, twenty-nine days for assault. This appeal followed.

The Defendant contends that the evidence is insufficient to support his aggravated kidnapping conviction. He argues that the evidence failed to establish that the victim's confinement was to a greater degree than that necessary to commit the assault and rape offenses. He does not challenge the rape, aggravated assault, and assault convictions. The State responds that the evidence was sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 SW.3d at 380-381.

Tennessee Code Annotated section 39-13-304(a)(4) provides that "[a]ggravated kidnapping is false imprisonment . . . [c]ommitted to [w]here the victim suffers bodily injury[.]" "Kidnapping is false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." *Id.* § 39-13-303(a) (2018). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id*. § 39-11-302(b).

Whether a defendant intended the consequences of a knowing act is irrelevant. *State v. Gray,* 960 S.W.2d 598, 604-05 (Tenn. Crim. App. 1997). In *State v. White*, our supreme court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." 362 S.W.3d 559, 577 (Tenn. 2012) (internal citations omitted). Trial courts have the obligation to provide clear guidance to the jury with regard to statutory language and must "ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578.

Our supreme court established a non-exhaustive factor test to determine whether a jury instruction regarding confinement should be given so "juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* The *White* court said that in such cases the instruction should provide as follows:

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

[1] the nature and duration of the victim's removal or confinement by the defendant;

[2] whether the removal or confinement occurred during the commission of the separate offense;

[3] whether the interference with the victim's liberty was inherent in the nature of the separate offense;

-19-

[4] whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

[5] whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

[6] whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*Id.* at 580-81 (footnotes omitted). Further, the instruction should state that "[u]nless you find beyond a reasonable doubt that the . . . victim's removal or confinement exceeded that which was necessary to accomplish the alleged [insert offense] and was not essentially incidental to it, you must find the defendant not guilty of [insert offense]." T.P.I.—Crim. 8.01 (kidnapping) (25th ed. 2021). The purpose of the *White* instruction is to ensure the confinement or removal associated with a kidnapping-related charge is not merely incidental to accomplishing another felony, such as robbery, assault, and rape. *See State v. Alston*, 465 S.W.3d 555, 562 (Tenn. 2015) ("We have also identified certain crimes – such as robbery, rape, and assault – that, when charged along with kidnapping, would warrant [the *White*] instruction.").

The Defendant does not argue that the trial court failed to provide the *White* instruction, as required by law, and the record reflects that the trial court properly instructed the jury in this regard. The Defendant argues, rather, that any confinement was incidental to the underlying offenses. He focuses on the lack of a "temporal connection" between the confinement and the underlying offenses. However, the jury was properly instructed relative to *White* and determined after considering all the evidence that the victim's confinement or removal exceeded that which was necessary to accomplish rape and aggravated assault.

In the light most favorable to the State, the evidence reflects that while the victim spent the day with her friends, the Defendant sent text messages and lured the victim to the home by threatening to throw away her late-grandmother's belongings if the victim did not come to get them on the night of the incident. The Defendant knew nobody would be at the home at the time of the incident. The victim arrived at approximately 10:00 p.m., and the Defendant and the victim argued outside the home. The Defendant shoved the victim, who fell backward and moved under the Defendant's truck to "get away from him." The Defendant retrieved the victim's cell phone from her car and pulled her out from under the truck, which resulted in injuries to her extremities. The victim attempted to "fight with" the Defendant and attempted to hold onto the home's backdoor frame to prevent the

Defendant from pulling her inside, but the Defendant pulled her inside the home and into his mother's bedroom, closing the door behind them. The victim acknowledged that she might have damaged the doorway, knocking off the doorbell camera which later lay on a table outside the home, during the struggle.

Inside the bedroom, the Defendant demanded to view the victim's cell phone, and each time she refused, the Defendant struck her on the face with an open hand. When the victim ultimately provided the passcode to her phone, the Defendant was no longer interested in her phone and told her to undress. When the victim refused, the Defendant struck her again. She ultimately complied with the Defendant's instructions and lay on the bed. The Defendant penetrated the victim's mouth and vagina with his penis as she cried and made clear that she "did not want to do this." After the sexual assault, the Defendant dressed, and the victim "had to beg for his permission to go to the bathroom." She did not believe she was free to leave. The Defendant opened the door to the bathroom, and the naked victim went inside, closing the door behind her. When she heard the Defendant's footsteps move away from the bathroom door, she escaped the home through the bathroom window. Although the victim escaped the home, the Defendant "tackled" her in the yard and held her down to prevent the driver of a passing vehicle from seeing him and the victim. Afterward, the Defendant grabbed the victim's hair, dragged her back to the home and inside the bedroom, and shoved her in the corner of the room. The Defendant struck the victim on her face with his fist multiple times, breaking her nose and orbital bone. The victim struck the Defendant with a glass dish to end the Defendant's assault, but the Defendant became angrier and continued striking her.

Although the Defendant threatened to kill them both during the incident, the victim successfully calmed the Defendant and convinced him that they should go outside to smoke. The victim had no intention of smoking and only wanted to create an opportunity for her to leave. When they were outside the home and the Defendant retrieved his cigarettes from his truck, the victim ran to her car and attempted, again, to flee. However, as the victim attempted to drive away, the Defendant reached inside the car, grabbed the steering wheel, which resulted in the tire marks in the yard, and pulled the victim from the moving car. The victim again attempted to flee by running toward a nearby neighbor's home, but the Defendant again tackled her and pinched her throat to stop her screams. The Defendant pulled the victim by her hair, again, toward the home, but she stood to prevent her naked body from being dragged across the concrete driveway. When the Defendant asked why the victim continued to run from him, she said "[b]ecause I don't want to die." They returned to a picnic table outside the home.

The victim begged to go to the hospital. The Defendant relented on the conditions that the victim bathe and that she tell medical staff her injuries resulted from an ATV accident. The victim agreed to the conditions, and the Defendant stood in the bathroom with the victim while she sat in the bathtub. Afterward, the Defendant gave the victim a

clean t-shirt and drove her to the hospital thirty minutes away. The Defendant and the victim arrived at the hospital at 1:30 a.m., and the Defendant remained with the victim at the hospital until 2:01 a.m.

Based upon this evidence, a rational jury could determine that the victim's removal or confinement was to a greater degree than that necessary to commit the rape and assault offenses. The evidence reflects that the Defendant confined or removed the victim from approximately 10:00 p.m. to 1:00 a.m. at the home and prevented her from escaping twice, once after the rape was accomplished and, again, after the assault resulting in her broken nose and orbital bone occurred. "[P]roof of a specific distance or period of time" of the removal or the confinement is not required by our kidnapping statutes and that the only requirement is that the confinement or removal "interfere substantially" with a victim's liberty. *White*, 362 S.W.3d at 576; *see State v. Taylor*, 63 S.W.3d 400, 408 (Tenn. Crim. App. 2001) (The "aggravated kidnapping statute does not require a particular distance of removal or any particular duration or place of confinement."). After the victim's second attempt to escape, the Defendant continued to confine her until she agreed to his conditions that she bathe and that she report to medical staff that her injuries resulted from an ATV accident. Likewise, during the incident, the victim attempted to summon assistance from a passing vehicle and from a nearby neighbor. The Defendant tackled her each time, preventing her from summoning assistance and reducing the Defendant's risk of detection. As a result, a rational jury could have concluded beyond a reasonable doubt that the Defendant committed the offense of aggravated kidnapping. The Defendant is not entitled to relief on this basis.

In reaching this conclusion, we have not overlooked the Defendant's argument that the victim's attempted escapes throughout the continuous three-hour incident at the home resulted in distinct, "separate confinement[s]" that were merely incidental to the underlying offenses. We find this argument unpersuasive. The victim's unsuccessful attempts to end the Defendant's confinement of her after each of the underlying offenses was committed does not support a conclusion that the victim was no longer confined. To the contrary, the victim's attempts to flee the home and the Defendant were quickly thwarted by the Defendant's tackling the victim and his removing her from a moving car. The evidence does not reflect that the victim was free to leave the home or the Defendant after the underlying offenses were completed.

The jury was properly instructed by the trial court, and the evidence supports the jury's verdict. The victim testified that she did not feel free to leave after the rape and had to beg the Defendant to be able to use the bathroom. After the Defendant allowed her to use the bathroom and escorted her to the bathroom, she attempted to escape only to be tackled by the Defendant in the yard, dragged back inside the home, and thrown into a corner. After the aggravated assault, which resulted in a broken nose and orbital bone, the victim suggested they go outside to smoke a cigarette, and she, again, ran from the home

-22-

and the Defendant. The Defendant pulled her from a moving car, threw her onto the ground, and, again, dragged her by her hair toward the home. Further, to the extent that the Defendant argues the victim's convincing the Defendant to go outside to smoke a cigarette and to sit on a picnic table outside the home showed the victim was no longer confined, the evidence reflects that the victim remained against her will as a result of the Defendant's force. *See State v. Bobby Joe Lester*, 2005 WL 1798763, No. W2004-00842-CCA-R3-CD, at \*4 (Tenn. Crim. App. July 28, 2005) (citing *State v. Davis*, 656 S.W.2d 406, 409 (Tenn. Crim. App. 1983) (A kidnapping occurs when a "person remains with the accused against their will as a result of force or the use of arms by the accused.") (Hayes, J., dissenting, concluding the specific facts of the case did not support determinations that the victim was confined based upon fraud and that the victim expressed a desire to leave)). The victim testified that she attempted to escape because she did not want to die. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE